## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____ )
  )
  )
THE SUESSENBACH FAMILY  )
LIMITED PARTNERSHIP, JAMES S.  )   Civil Action No. _____
SUESSENBACH, and GINA M.  )
SUESSENBACH, individually and on  )
behalf of all others similarly situated,  )
  )   **CLASS ACTION COMPLAINT**
        Plaintiffs,  )
  )
    v.  )
  )   **JURY TRIAL DEMANDED**
ACCESS MIDSTREAM PARTNERS,  )
L.P. and CHESAPEAKE ENERGY  )
CORPORATION,  )
  )
        Defendants.  )
  )
_____ )

## **TABLE OF CONTENTS**

I. INTRODUCTION ....................................................................................1

II. JURISDICTION AND VENUE ...........................................................4

III. PARTIES ...............................................................................................5

    A. Plaintiffs ...................................................................................5

    B. Defendants................................................................................5

IV. FACTUAL ALLEGATIONS ................................................................6

    A. Extraction of Natural Gas by Hydraulic Fracturing and "Gathering" Costs.................................................................6

    B. Chesapeake Turns to Access Midstream to Avoid Financial Collapse ....................................................................9

    C. Lessors are Charged Inflated and Unreasonable Royalty Deductions....................................................................... 16

V. USE OF INTERSTATE MAILS AND WIRES TO CAUSE INJURY TO PLAINTIFFS AND THE CLASS ........................................ 20

VI. CLASS ACTION ALLEGATIONS .............................................. 23

VII. CAUSES OF ACTION.................................................................... 25

VIII. PRAYER FOR RELIEF ................................................................ 37

IX. DEMAND FOR JURY TRIAL ..................................................... 39

*"Chesapeake executed an adroit escape, raising nearly $5 billion . . . [b]y gouging many rural landowners out of royalty payments they were supposed to receive" — ProPublica*

Plaintiffs the Suessenbach Family Limited Partnership, James S. Suessenbach, and Gina M. Suessenbach (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants Access Midstream Partners, L.P. ("Access Midstream") and Chesapeake Energy Corporation ("Chesapeake") (collectively referred to herein as "Defendants"). Chesapeake Appalachia, LLC ("Chesapeake Appalachia") and Chesapeake Midstream Development, L.L.C. ("Chesapeake Midstream") are relevant non-parties. The following allegations are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.[1]

## I.    INTRODUCTION

1.    Since at least 2010 Chesapeake engaged in unlawful conduct to improperly extract billions of dollars in royalties owed to Plaintiffs and other lessors by artificially manipulating and deducting from royalty payments the cost of "marketing," "gathering," and "transporting" natural gas. The marketing, gathering, and transportation deductions at issue in this Action were both unreasonable and inflated by Defendants.

---

[1]    All emphases herein are added.

2.      As outlined in a March 13, 2014 article published by *ProPublica* entitled *Chesapeake      Energy's      $5      Billion      Shuffle*,      available      at http://www.propublica.org/article/chesapeake-energys-5-billion-shuffle,      (last visited June 20, 2014) (the "*ProPublica* Report") Chesapeake conspired with Access Midstream to continue its scheme to extract inflated royalty deductions from lessors.[2]      According to the *ProPublica* Report, Chesapeake artificially inflated deductions charged to lessors in order to, *inter alia*, satisfy an off-balance-sheet loan from Access Midstream that was disguised as asset sales.  The purpose of the off-balance sheet loan was to hide Chesapeake's need to "raise billions of dollars quickly" without alerting the market to its financial troubles when it was already saddled with billions of dollars in debt.  *See id.*

3.      Access Midstream, Chesapeake's co-conspirator, was more than eager to participate in the scheme.   In return for "purchasing" $4.76 billion in gas transportation lines from Chesapeake, Access Midstream was  guaranteed to recover $5 billion plus a 15% return on its pipelines over the next decade—all of which would be shouldered by inflated expenses charged to the class.  *See id.*

---

[2]      *ProPublica* is a highly respected non-profit organization that produces investigative journalism.  *ProPublica* has been awarded two Pulitzer Prizes and a Peabody Award (the highest honor in broadcast journalism) in 2013.  *See* http://www.propublica.org/awards/, last accessed June 20, 2014.   Moreover, *ProPublica*'s investigations have been cited by federal courts when evaluating the sufficiency of plaintiffs' pleadings.  *See e.g.*, *Garden City Employees' Retirement System v. Psychiatric Solutions, Inc.*, 2011 WL 1335803, at *27 (M.D. Tenn. Mar. 31, 2011) (noting allegations based on *ProPublica*'s investigation).

4.     The deals were highly favorable to Access Midstream.  According to J. Michael Stice, Access Midstream's Chief Executive Officer, "[i]t doesn't get any better than this."  *See id.*  For lessors, however, the Chesapeake-Access Midstream deals could not get any worse.

5.     The Chesapeake-Access Midstream deals were not the only mechanism used by Chesapeake to fleece lessors out of royalty payments and, as evidenced by the following statements, the full scope of Defendants' scheme has not been fully revealed.

6.     Specifically, earlier this year Pennsylvania Governor Tom Corbett wrote to Robert Lawler, Chesapeake's Chief Executive Officer to express his concerns over the Company's unwillingness to address Pennsylvania citizens' grievances over post-production costs being extracted by Chesapeake from royalty payments.  *See* Exhibit A.  Governor Corbett, in a separate letter to Dough McLinko, Chairman of the Bradford County Board of Commissioners, stated that "[o]ur efforts to receive straightforward answers [from Chesapeake regarding royalty deductions] *have led to even more confusion*. . . ."  Exhibit B.  The letter noted that Governor Corbett requested that Pennsylvania Attorney General Kathleen Kane investigate Chesapeake's deductions from royalty payments.  *See id.*  Pennsylvania State Senator Gene Yaw also wrote to Attorney General Kane and described Pennsylvanians' description of Chesapeake's deductions as

"*cheating*," "*stealing*," and "*fraud*."   Exhibit C.   Senator Yaw's letter further noted that the offensive conduct "seems to be isolated to Chesapeake."  *Id.*

7.    Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, as well as pursuant to common law principles of unjust enrichment, conversion, and civil conspiracy to commit the underlying offences, and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and other lessors sustained as a result of Defendants' illegal conduct.  The First, Second, and Fifth Causes of Action alleged below and all claims against Access Midstream are pleaded from December 31, 2012 to the present.  All other claims are pleaded over the entire Class Period.

## II.    JURISDICTION AND VENUE

8.    Jurisdiction arises from claims asserted herein pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331, 1332(d).  Plaintiffs and members of the class are citizens of a state different from Defendants and the amount in controversy exceeds $5 million.   Supplemental jurisdiction over state law claims exists pursuant to 28 U.S.C. § 1367.

9.    Venue is proper in this District pursuant to 18 U.S.C. § 1965(a)— which provides for venue in any district in which a RICO defendant transacts his

affairs—and 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and Defendants are subject to personal jurisdiction in this District.

## III.   PARTIES

### A.   Plaintiffs

10.   Plaintiff the Suessenbach Family Limited Partnership (the "Suessenbach Partnership") is a Pennsylvania limited partnership with a place of business in Terry Township, Bradford County, Pennsylvania.

11.   Plaintiffs James S. and Gina M. Suessenbach (the "Suessenbachs"), are residents of Bradford County, citizens of Pennsylvania, and are the principals of the Suessenbach Partnership.

12.   Certain properties and their associated oil and gas leases relevant to the allegations herein were transferred to the Suessenbach Partnership on or about November 4, 2011.  The Suessenbachs and the Suessenbach Partnership are collectively referred to as "Plaintiffs."

13.   In all, Plaintiffs lease nearly 140 acres of land for purposes of extracting natural gas to a consortium of oil and gas production companies, including Chesapeake Appalachia.

### B.   Defendants

14.   Defendant Chesapeake is the second largest producer of natural gas in the United States.  Chesapeake is a publicly traded oil and gas company

incorporated in Oklahoma with its headquarters at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.  Chesapeake's operations are focused on the development of onshore unconventional and conventional natural gas, especially through the use of hydraulic fracturing, or "fracking," in various shale formations throughout the United States, including shale formations in Pennsylvania.

15.     Defendant Access Midstream is a Delaware limited partnership, with a stated address at 525 Central Park Drive, Oklahoma City, Oklahoma 73105. Access Midstream was originally formed as Chesapeake Midstream Partners, L.P. on August 3, 2010.

16.     Chesapeake and Access Midstream are referred to herein as the "Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    Extraction of Natural Gas by Hydraulic Fracturing and "Gathering" Costs

17.     Induced hydraulic fracturing, commonly known as hydrofracking or fracking, is a technique used to release petroleum, natural gas (including shale gas, tight gas, and coal seam gas), or other substances for extraction.  The technique creates fractures from a wellbore drilled into reservoir rock formations.

18.     Fracking enables the production of natural gas and oil from rock formations below the earth's surface (generally 5,000 to 20,000 feet).  At such depth, there may not be sufficient permeability or reservoir pressure to allow

natural gas and oil to flow from the rock into the wellbore at economic rates. Given the extremely low natural permeability of shale, creating fractures in the rock is critical to extract gas from shale reservoirs.

19.    Large deposits of natural gas have been discovered in various shale deposits throughout the United States, including in Pennsylvania, and several oil and gas exploration and development companies have been actively accessing these deposits due to the development of fracking technology that allows the deposits to be exploited.

20.    The Marcellus Shale formation located in and beyond Pennsylvania is one of the largest natural gas reserves in the world.  Plaintiffs' lands are located in the Marcellus Shale.

21.    Gaining access to the deposits in shale regions, including the Marcellus Shale, typically involves purchasing or leasing land or mineral rights in the vicinity of suspected deposits and attempting to develop profitable wells.

22.    Once a natural gas deposit is reached, a wellhead is placed on the deposit.  After a wellhead is in place, natural gas can be moved from the well through gathering pipes and ultimately transported through an intrastate transmission pipeline.  Intrastate transmission pipelines connect to major interstate transmission pipelines which transport natural gas throughout the United States.

23.    The transport and processing steps which follow removal of natural gas from the wellhead, but precede entry of the gas into an interstate transmission pipeline, are sometimes referred to as "gathering."

24.    As illustrated in Access Midstream's 2013 Annual Report filed with the Securities and Exchange Commission ("SEC") on Form 10-K on February 21, 2014, Access Midstream operates between the lessors (at the wellhead) and the interstate pipeline system:



25.    While Federal rules limit fees that can be charged on the interstate pipelines to prevent gouging, drilling companies levy fees on local pipelines, known as gathering lines.[3]   However, even where such fees are deducted, they must be reasonable and actual.

26.    Processing can also include certain services to make gas suitable for entry into the interstate pipeline system, such as dehydration when the natural gas has a high water content.  As Access Midstream concedes, however, "[i]n general,

---

[3]      *See ProPublica* Report.

the natural gas in the northern Marcellus Shale is lean and typically requires little to no treatment to remove contaminants."[4]

**B.** **Chesapeake Turns to Access Midstream to Avoid Financial Collapse**

27.   Despite their dominant role in natural gas extraction in the United States, Chesapeake was experiencing severe financial difficulty, including funding gaps, reportedly due to major capital expenditures and lower natural gas prices and cash flow.  As a result, Chesapeake needed cash quickly to service its outstanding debt and fund its operations.[5]

28.   On August 3, 2010, Chesapeake formed Access Midstream and began spinning off its midstream assets, which included its natural gas gathering and intrastate pipeline operations, through a series of sales to Access Midstream in order to fund its ongoing operations.  During this time, Chesapeake was using its subsidiaries to artificially inflate deductions charged to lessors.

29.   In December 2011, Chesapeake completed the sale of Appalachia Midstream Services, L.L.C. ("AMS"), a wholly owned subsidiary of Chesapeake

---

[4]     Access Midstream Partners, L.P., Form 10-K, filed February 21, 2014.

[5]     *See*, *e.g.*, Christopher Helman, *Chesapeake Energy's New Plan:  Desperate Measures for Desperate Times*, FORBES, Feb. 13, 2012 (the "Forbes Report").

Midstream, and AMS's Marcellus Shale midstream assets for $865 million in total consideration.[6]

30.     Still needing "to fund the company's anticipated capital expenditures during 2012 and provide additional liquidity for 2013," Chesapeake announced in February 2012 its intent to sell additional midstream assets.[7]

31.     On December 20, 2012, Chesapeake completed the sale of its subsidiary Chesapeake Midstream Operating, L.L.C. ("CMO") to Access Midstream, including CMO's Marcellus Shale midstream assets, for $2.16 billion in total consideration.[8]

32.     When Chesapeake sought to spinoff its gathering operations, it turned to J. Michael Stice—the President and Chief Operating Officer of Chesapeake Midstream and Senior Vice President of Natural Gas Projects for Chesapeake from November 2008 through December 2012—to run the operation.  Stice then became the Chief Executive Officer of Access Midstream following its acquisition of the CMO midstream assets.

33.     Domenic J. Dell'Osso, Jr.—as the Executive Vice President and Chief Financial Officer of Chesapeake since November 2010 and Chief Financial Officer

---

[6]     Access Midstream Partners, L.P., Form 8-K, filed Jan. 4, 2012.

[7]     Chesapeake Energy Corporation, *Chesapeake Energy Corporation Provides Details on its Financial Plan for 2012*, BUSINESS WIRE, Feb. 13, 2012.

[8]     Access Midstream Partners, L.P., Form 8-K, filed Dec. 26, 2012.

of Chesapeake Midstream from August 2008 to November 2010—was also intimately familiar with the scheme.

34.     Stice and Dell'Osso have served as directors of Access Midstream's general partner, Access Midstream Partners GP, L.L.C., since July 2012 and July 2011, respectively.

35.     According to the *ProPublica* Report, post-spinoff agreements between Chesapeake and Access Midstream guarantee that Chesapeake and certain of its subsidiaries and affiliates get a rebate of some of the monies they will pay out to Access Midstream in the form of payments for services and additional assets.[9]

36.     Among other specific items, Access Midstream received a guarantee from Chesapeake that personnel and employees would be made available to it during a transitional period and that certain services would be provided to Access Midstream that would be paid going forward.[10]   Notably, Access Midstream is managed and directed by former and current Chesapeake officers, has made extensive use of other Chesapeake employees in conducting its operations, and continues to pay Chesapeake and other affiliates and subsidiaries for a variety of services.

---

[9]     *See ProPublica* Report.

[10]    Access Midstream Partners, L.P., Form 10-K, filed Feb. 25, 2013; *see also* Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed Dec. 19, 2012; Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed June 20, 2012.

37.     In connection with Access Midstream's acquisition of Chesapeake Midstream's operating assets, Access Midstream replaced Chesapeake Midstream as the beneficiary of certain contractual obligations and entered into gas gathering agreements with several Chesapeake subsidiaries (the "Gathering Agreements").[11]

38.     Pursuant to the Gathering Agreements, Chesapeake's subsidiaries agreed to pay Access Midstream for natural gas gathering and transportation services, including *intra*state transport.[12]

39.     For example, under the Gathering Agreement covering CMO's former Marcellus Shale assets (the "Marcellus Gathering Agreement"), Chesapeake Appalachia's payments to Access Midstream for gas gathering and transportation services are referred to as the "Marcellus fee" and described as "a cost-of-service based fee."[13]

40.     However, this characterization is misleading and false.   As the *ProPublica* Report details, the fee is not "cost-of-service" based but was instead intended to provide Access Midstream with a guaranteed, above-market return as an incentive and consideration for the payments it made to Chesapeake.   As explained by *ProPublica*, "[a]n executive at a rival company who reviewed the deal at ProPublica's request said it looked like **Chesapeake had found a way to**

---

[11]     *See, e.g.*, Access Midstream Partners, L.P., Form 8-K, filed Dec. 26, 2012.

[12]     *Id.*

[13]     *Id.*

*make the landowners pay the principal and interest on what amounts to a multi-billion loan to the company from Access Midstream*."[14]

41.     In fact, the Marcellus Gathering Agreement has a 15-year term and provides that, on January 1 of each year, the Marcellus fee will be recalculated to provide "a specified pre-income tax rate of return on invested capital."[15]  In other words, it was structured to insure a guaranteed rate of return to Access Midstream for a 15-year period.[16]

42.     *ProPublica* has reported that the rate of return is 15% per year: "Chesapeake pledged to pay Access enough in fees to **repay the $5 billion plus a 15 percent return** on its pipelines."[17]

43.     Chesapeake's ability to follow through on its promise to lock in Access Midstream's rate of return relies on continued inflation of gathering costs and other services paid to Access Midstream and deducted from oil and gas lessors' royalty payments.

44.     Fully aware of the true market rates of such services, Chesapeake and its subsidiaries agreed to this above-market rate of return and then Chesapeake agreed to pay Access Midstream supra-competitive prices for natural gas gathering

---

[14]     *See ProPublica* Report.

[15]     *Id*.

[16]     *See Forbes* Report.

[17]     *See ProPublica* Report.

and transportation services, as part of the renewed agreement with Access Midstream and to repay the off-balance sheet loan provided by Access Midstream to Chesapeake.

45.     Chesapeake's subsidiaries, such as Chesapeake Appalachia, have, in turn, passed the costs of the services along to Pennsylvania oil and gas lessors, such as Plaintiffs, by deducting the inflated expenses built into the Marcellus fee from lessors' royalty payments.

46.     The *ProPublica* Report details how Chesapeake subsidiaries have deducted amounts far in excess of their payments to Access Midstream for gas gathering and transportation services.  Chesapeake's subsidiaries have paid fees, which are then charged to lessors, for gas pipeline transport to Access Midstream that are many multiples of Access Midstream's actual costs.  In one example, *ProPublica* reported that the markup was in excess of 3,000%:[18]



## The Great Chesapeake Markup

**9¢**

**What it Cost**

It cost Access Midstream 9 cents per 1,000 cubic feet (Mcf) to move gas through the pipelines connected to Joe Drake's farm.

**85¢**

**What Chesapeake Paid**

Chesapeake paid Access 85 cents per Mcf to move gas through Access's national pipeline network (on average).

**$2.94**

**What They Charged Drake**

Chesapeake then charged Joe Drake $2.94 per Mcf — more than 30 times the actual cost and three times what they paid Access on average — to transfer Drake's gas through the pipeline.

*Source: ProPublica* Report

---

[18]     *Id*.

47.   As one of Chesapeake's competitors stated, "[t]hey were trying to figure out a way to raise money and keep their company alive [and] they looked at it as a way to get disguised financing … that is going to be repaid at a premium."[19]

48.   These wrongful royalty deductions are detailed in Plaintiffs' royalty statements, further described herein and attached hereto as Exhibit D.  Plaintiffs relied on and assumed that the deductions in the royalty statements were reasonable.

49.   These deductions were inflated, improper, completely unrelated to the "cost of services," did not serve to enhance the marketability of gas, and instead, merely served to enrich the co-conspirators who devised the scheme.

50.   The benefit to Access Midstream is clear.  Access Midstream's predominant source of revenue is gathering fees and Chesapeake accounts for approximately 84% of Access Midstream's business.[20]

51.   Due in part to Stice's positive statements and other disclosures about the nature of Access Midstream's guaranteed revenues, the broader market is also beginning to understand the boon to Access Midstream.  As of June 16, 2014, Access Midstream's common stock (NYSE: ACMP) was trading at $66.57 per

---

[19]   *Id.*

[20]   *See* ProPublica Report.

share, more than double the $32.41 per share it traded at on December 14, 2012, the week before the acquisition of Chesapeake Midstream's assets was completed.

### C. Lessors are Charged Inflated and Unreasonable Royalty Deductions

52.     In order to facilitate Chesapeake's drilling and fracking operations in the Marcellus Shale formation, Chesapeake's subsidiaries, such as Chesapeake Appalachia, enter into agreements to lease land from Pennsylvania residents.  In some cases, Chesapeake's subsidiaries purchase rights to existing leases to which it becomes a party as lessee.  These lease agreements, such as those originally entered into by the Suessenbachs, give Chesapeake's subsidiaries the right to extract oil and natural gas from lessors' lands and to transport and sell the oil and gas.[21]

53.     In return for the right to extract oil and gas, the lease agreements promise a royalty to the lessors based on the price ultimately realized by Chesapeake's subsidiaries for the oil and gas.  Pursuant to Pennsylvania's

---

[21]     The Suessenbachs entered into an oil and gas lease with Anadarko E&P Company LP ("Anadarko") on or about May 11, 2006 covering 135.6 acres of their property (the "Primary Lease").  *See* Exhibit E.  Subsequently, prior to May 28, 2010 Chesapeake Appalachia entered into an agreement with Anadarko to purchase a portion of the Suessenbachs' leasehold and thereby became bound by its terms.  *See* Exhibit F (May 28, 2010 Ratification and Amendment of Oil and Gas Lease, stating that "the Lease is now owned by Anadarko … Chesapeake Appalachia … and Statoil USA Onshore Properties Inc.").  Separately, on or about December 19, 2008, the Suessenbachs entered into a Paid Up Oil & Gas Lease directly with Chesapeake Appalachia for a small 2-acre parcel of land not previously covered by the Primary Lease (the "2-Acre Lease").  *See* Exhibit G.

Guaranteed Minimum Royalty Act ("GMRA"), that amount is the *minimum*

permissible by law and requires leaseholders to receive at least 12.5%, or one-

eighth, of the sales price of the gas extracted from their land.  *See* 58 P.S. § 33.3.

54.    The Primary Lease states:

LESSEE shall pay the LESSOR on oil and liquid hydrocarbons
produced and saved from the premises … the market value at the well
of one eighth (1/8) of the oil and liquid hydrocarbons so used or sold.
In no event shall the gas royalty payable hereunder be computed on
the basis of a price the collection of which by LESSEE is unlawful or
prohibited by order or regulation of any governmental authority
having jurisdiction, and market value at the well shall not exceed the
amount realized by LESSEE for such production computed at the well
… LESSEE may pay all taxes and fees levied upon LESSOR's
royalty share of production of oil and gas, and deduct the amount so
paid from any monies payable to LESSOR hereunder.

*See* Exhibit E.

55.    The 2-Acre Lease states:

[Lessee agrees] [t]o pay Lessor an amount equal to one-eighth (1/8) of
the revenue realized by Lessee for all gas and the constituents thereof
produced and marketed from the Leasehold, less the cost to transport,
treat and process the gas and any losses in volumes to point of
measurement that determines the revenue realized by Lessee.

*See* Exhibit G.

56.    The Primary Lease allows deductions for the "production of oil and

gas" and the 2-Acre Lease identifies deductions for "the *cost* to transport, treat and

process the gas," but nowhere does either lease permit deductions in excess of

actual cost or which are unreasonable.

57.     Contrary to Defendants' conduct, royalty deductions must be reasonable and, at the very least, must be proportionate to lessors' minimum guaranteed royalty under the GMRA (*i.e.*, lessors' post-production deductions cannot exceed 12.5% of total post-production costs).

58.     Notwithstanding these limitations, Defendants, under the guise of Chesapeake's subsidiaries' agreements with lessors, exploited deductions language from the lease agreements to, among other things, shift repayment of Chesapeake's off-balance sheet loan from Access Midstream to the lessors.

59.     Improper royalty deductions taken from lessors are evident from Plaintiffs' royalty statements, attached as Exhibit D, relating to the Primary Lease, including the following:

- October 23, 2012 deduction of approximately 23% from the royalty payment;

- November 21, 2012 deduction of approximately 25% from the royalty payment;

- February 21, 2013 deduction of approximately 19% from the royalty payment;

- April 23, 2013 deduction of approximately 21% from the royalty payment;

- May 23, 2013 deduction of approximately 19% from the royalty payment;

- October 23, 2013 deduction of approximately 24% from the royalty payment; and

- January 31, 2014 deduction of approximately 39% from the royalty payment.

60.     By taking these (and other) deductions, and thereby reducing royalty payments, Defendants capitalized on a contract to which they were not parties, but through which they could produce guaranteed revenue by forcing class members to pay grossly inflated deductions.

61.     Notably, Chesapeake reported to investors in September 2013 that its expenses related to pipeline and marketing business roughly doubled in the months after it sold certain pipelines and that its revenues for that part of the business also increased accordingly, covering the new costs.[22]

62.     Industry analysts were at a loss to explain it.   As reported by *ProPublica*:

- Fadel Gheit, a seasoned industry analyst for the investment firm Oppenheimer, who estimated the figure was off by a decimal point before later confirming that it matched the numbers Chesapeake had reported to the SEC, stated, "[s]omething is wrong with this calculation … It can't be."

- Kevin Kaiser, a financial analyst with Hedgeye, a private equity group in New York, stated, "[t]he change in marketing, gathering, compression revenue and expense is staggering."

- None of the financial analysts who cover Chesapeake that ProPublica spoke with could explain the explosion in Chesapeake's marketing and transportation revenues and expenses using oil sales alone.[23]

---

[22]     *See* ProPublica Report.

[23]     *Id.*

## V.   USE OF INTERSTATE MAILS AND WIRES TO CAUSE INJURY TO PLAINTIFFS AND THE CLASS

63.   The scheme alleged herein constitutes mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

64.   The conduct of Defendants and their co-conspirator, Chesapeake Appalachia, as described in this complaint, constituted the execution of a scheme and artifice to deprive oil and gas lessors in Pennsylvania of royalties properly due them by means of fraudulent pretenses and representations through the use of the United States mail, in violation of 18 U.S.C. § 1341.

65.   Their use of the mails formed a central feature of the scheme and included, by way of example and as described above, sending oil and gas lessors royalty statements and royalty payments which reflected deductions for artificially inflated gas gathering and transportation fees pursuant to gathering agreements. Hundreds, and likely many thousands, of such royalty statements and royalty payments have been sent to Pennsylvania lessors through the mails and wires across state lines.  Each of these statements and payments fraudulently represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases.

66.     Moreover, Defendants and their co-conspirator, Chesapeake Appalachia, made fraudulent and untrue statements regarding deductions and volume adjustments for marketing that were represented to reflect legitimate costs rather than the scheme as alleged herein, including by multiple email transmissions on July 31, 2013.  *See* Exhibit H.

67.     By way of example only, because there are numerous additional instances, royalty statements sent to Plaintiffs, attached hereto as Exhibit D, and described in detail further herein, each represent an instance of mail fraud on the following dates: October 23, 2012, November 21, 2012, February 21, 2013, April 23, 2013, May 23, 2013, July 24, 2013, October 23, 2013, January 31, 2014.

68.     The conduct described above constituted multiple violations of mail fraud, 18 U.S.C. § 1341, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

69.     In addition, Defendants and their co-conspirator, Chesapeake Appalachia, have, on a monthly basis transferred payments between themselves by wire, which payments were made pursuant to the non-arm's length and conspiratorial agreements described herein.   This conduct constituted multiple violations of wire fraud, 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

70.     The scheme alleged herein also constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

71.     The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

72.     The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

73.     The wire fraud statute is in relevant respects identical.  *See* 18 U.S.C. § 1343.

74.     Congress broadened the scope of the mail and wire fraud statutes by enacting 18 U.S.C. § 1346.  That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

75.     At all relevant times, Defendants and their co-conspirator, Chesapeake Appalachia, owed legal duties to render services to lessors.  In all cases, those duties included extracting oil and natural gas and deducting expenses only where appropriate.  The value of these services depended on Defendants and Chesapeake

Appalachia rendering those services in an honest manner.   Nevertheless, Defendants misused their position and thereby breached their obligation to render "honest services" to lessors.  Defendants devised a scheme or artifice to defraud Plaintiffs and other land owners of their intangible right to Chesapeake Appalachia's honest services through these inflated deductions.

76.   The wire and mail fraud violations carried out by Defendants, including "honest services" fraud, constitute predicate acts under RICO.   The pattern of racketeering activity alleged herein has proximately harmed Plaintiffs and the class.

## VI.   CLASS ACTION ALLEGATIONS

77.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and/or (b)(3) on behalf of the following Class:

> All Pennsylvania lessors having oil and gas leases in which Chesapeake Appalachia, LLC was a party during the period August 3, 2010 through the present and has made deductions from the lessor's royalty payments.

78.   The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors, and assigns.

79.   The Class is so numerous that joinder of all members is impracticable.

80.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

81.     Plaintiffs' claims are typical of the claims of the Class.  As alleged herein, Plaintiffs and members of the Class all sustained damages arising out of the Defendants' common course of unlawful conduct.

82.     There are questions of law and fact common to the Class, including but not limited to:

- Whether Defendants have engaged in a common scheme, plan and course of conduct to impose inflated gas gathering and transportation costs on oil and gas lessors through a collusive pricing structure;

- Whether Defendants' scheme has resulted in the improper deduction of inflated gas gathering and transportation costs from royalties owed to Plaintiffs and Class members and whether Chesapeake Appalachia failed to pay Plaintiffs and Class members the proper due and owed oil and gas royalties;

- Whether Defendants have intentionally interfered with the agreements and contracts between Chesapeake Appalachia and Plaintiffs and Class members without justification by compelling Chesapeake Appalachia to separately contract Access Midstream to provide inflated gathering services which were then deducted from royalty payments, thereby failing to pay Plaintiffs and Class members the proper due and owed oil and gas revenues;

- Whether Defendants have converted assets belonging to Plaintiffs and the Class;

- Whether Defendants have engaged in a civil conspiracy injuring Plaintiffs and the Class;

- Whether Plaintiffs and Class members have suffered damage as a result of Defendants' conduct; and

- The appropriate measure of damages.

83.     Class action status is warranted under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

84.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

85.     Plaintiffs anticipate no difficulty in the management of this matter as a class action.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968

86.     Plaintiffs incorporate the preceding allegations by reference.

87.     Plaintiffs, each member of the Class, and each Defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

**The Enterprise**

88.     For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Defendants, including their respective officers, directors, employees, agents, and

direct and indirect subsidiaries (the "Enterprise").  The Enterprise was separate and distinct from the persons that constituted the Enterprise.

89.   The Enterprise was primarily managed by Chesapeake, which organized the fraudulent scheme and procured the involvement of Access Midstream.  Each of the Defendants, however, agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent discretion.

90.   The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding leaseholders by overcharging them for costs associated with extraction of oil and natural gas which the co-conspirators deemed to be expressly permitted by leaseholder agreements between lessors and Chesapeake Appalachia.   At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce.  The proceeds of the Enterprise were distributed to its participants, including Chesapeake and Access Midstream.

91.   The Enterprise has operated since at least 2010, and its operation is ongoing.  The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

**The Pattern of Racketeering Activity**

92.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described in this complaint.  The Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a.  Defendants knew that the fees charged by Access Midstream, including under the Marcellus Gathering Agreement, were far in excess of the market rates of such fees;

b.  Defendants also knew and agreed that Access Midstream would rebate a portion of these inflated fees to Chesapeake and its subsidiaries and affiliates, ostensibly for the use of other equipment and services;

c.  Defendants also knew and agreed that the inflated gas gathering and transportation fees would be passed along to Pennsylvania oil and gas lessors by Chesapeake Appalachia in the form of cost deductions from the lessors' royalty payments;

d.  The unlawful conduct by Defendants, through the alleged association-in-fact Enterprise, deprived thousands of lessors of their rightful royalty

payments, was continuous and open-ended, and was intended to continue, and continues today; and

e. Plaintiffs and the members of the Class were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of Defendants.  The financial harms suffered by Plaintiffs and members of the Class were the direct result of that conduct and were the intended and reasonably foreseeable consequence of such conduct.

**The Predicate Acts of Mail and Wire Fraud Including "Honest Services" Fraud**

93.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Defendants engaged in an intentional scheme or artifice to defraud lessors and to obtain money or property from said lessors through false or fraudulent pretenses, representations, and promises.

94.    The conduct of Defendants in violation of the mail and wire fraud statutes included, without limitation, a fraudulent scheme to deprive the lessors of their intangible rights to Chesapeake Appalachia's "honest services" in violation of 18 U.S.C. § 1346.  As alleged herein, Chesapeake Appalachia owed a contractual obligation to render services to the lessors.  Chesapeake Appalachia owed a duty to render those services in an honest manner.  Nevertheless, Defendants misused their position to interfere with the contractual obligations to which the lessors were

entitled.  Chesapeake Appalachia thereby was caused to breach its obligations to render "honest services."  Defendants also owed a duty not to charge unreasonable fees to Chesapeake Appalachia which, known by Defendants, would be passed on to lessors.  Each of the Defendants intentionally and willfully conspired and participated in the "honest services" violations.  Specifically, each of the Defendants participated in devising and carrying out the scheme through the activities alleged above.

95.    It was reasonably foreseeable to the Defendants that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

96.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions.  The precise dates of such transmissions cannot be alleged without access to the books and records of the Defendants.  Nevertheless, Plaintiffs can allege such transmissions generally and with reference to the royalty statements attached hereto as Exhibit D.

97.    For the purpose of furthering and executing the scheme, the Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data, and funds, and also regularly caused matters and things to be placed in post offices or authorized

depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier.

98.   Defendants utilized the mails and/or wires for the purpose of furthering and executing the scheme.

99.   The royalty statements attached as Exhibit D are only examples of instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by the Defendants.   Each electronic and/or postal transmission was incident to an essential part of the scheme.   As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

100.   Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud lessors.

101.   Defendants each participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud lessors into paying and/or incurring falsely inflated, unauthorized charges in connection with their oil and gas leases.

102.   The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).   The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding lessors to pay and incur the falsely inflated, unauthorized charges with respect to oil and gas leases and thereby enable Defendants to reap illicit profits.

103.   Defendants were common participants in the predicate acts.   Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive lessors.

**Injury to Plaintiffs and the Class**

104.   As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).   Plaintiffs and the Class paid falsely inflated, unauthorized royalty deductions by reason, and as a direct, proximate, and foreseeable result, of the scheme alleged.   Plaintiffs' continued payment of inflated and unreasonable deductions evidence their reliance on the Defendants' misstatements.

105.   Moreover, the overcharging of Plaintiffs and the Classes for gathering services was an integral and necessary part of the scheme, as those overcharges constituted repayment of, among other things, the cash payment made by Access Midstream to Chesapeake and referenced in the *ProPublica* Report.

106.   Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## SECOND CAUSE OF ACTION:
## CONSPIRACY TO VIOLATE THE RACKETEER
## INFLUENCED AND CORRUPT ORGANIZATIONS ACT,
## 18 U.S.C. § 1962(d)

107.   Plaintiffs incorporate the preceding allegations by reference.

108.   RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

109.   The Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

110.   As set above, at all relevant times, Plaintiffs and the members of the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

111.   As also set forth above, at all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

112.   Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging lessors with respect to royalty deductions.  The purpose thereof was to induce lessors to pay or incur fraudulently inflated, improper royalty deductions.

113.   The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

32

114.   As set forth above, Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

115.   Defendants were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

116.   Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to accomplish the objects thereof, including but not limited to the acts set forth herein.

117.   As a direct and proximate result of the overt acts and predicate acts of in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.   Such injuries include, but are not limited to, fraudulently inflated royalty deductions, as a direct, proximate, and foreseeable result of the scheme alleged herein.

118.   Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## THIRD CAUSE OF ACTION:
## UNJUST ENRICHMENT

119.   Plaintiffs incorporate the preceding allegations by reference.

120.   Defendants, by their policies and actions, benefited from, and increased their profits by effecting a scheme which deprived Plaintiffs and the Class of the full royalties due to them.

121.   Chesapeake benefited from the royalty amounts wrongfully withheld by its subsidiary, Chesapeake Appalachia, whose financial results are included in Chesapeake's and whose costs were substantially reduced by not paying the proper royalty amounts.

122.   Access Midstream benefited from the royalty amounts wrongfully withheld by Chesapeake Appalachia because some of the monies which should have been paid to oil and gas lessors were, instead, paid to Access Midstream.

123.   Defendants accepted and received the benefits of royalty monies properly due Plaintiffs and the Class.  It is inequitable and unjust for Defendants to retain these monies, which were procured by fraudulent pretenses and representations.

124.   Plaintiffs and the Class are entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by Defendants, plus interest on these amounts.

## FOURTH CAUSE OF ACTION:
## CONVERSION

125.   Plaintiffs incorporate the preceding allegations by reference.

126.   Defendants wrongfully and intentionally caused deductions to be taken from lessors' royalty payments.

127.   Plaintiffs and members of the Class were entitled to receive the wrongfully deducted amounts pursuant to leasehold contracts.

128.   As alleged above, Defendants collected these wrongful deductions through agreements between affiliates of Chesapeake and Access Midstream that resulted in charges assessed against lessors' royalty payments by Chesapeake Appalachia.

129.   Defendants have retained these funds unlawfully without the consent of Plaintiffs or members of the Class and have deprived them from exercising control over these funds which belong to Plaintiffs and the Class.

130.   Defendants intend to permanently deprive Plaintiffs and the Class of these funds.

131.   The funds are specific and readily identifiable pursuant to royalty statements largely in the control of Defendants or Chesapeake Appalachia.

132.   The funds taken by Chesapeake Appalachia ultimately were received by Defendants as a part of the coordinated conduct alleged herein.

133.   As a direct and proximate result of Defendants' wrongful conversion, Plaintiffs and the Class have suffered and continue to suffer damages.  Plaintiffs and the Class are entitled to recover from Defendants all damages and costs permitted, including all amounts wrongfully converted, which are specific and readily identifiable.

## FIFTH CAUSE OF ACTION:
## CIVIL CONSPIRACY

134.   Plaintiffs incorporate the preceding allegations by reference.

135.   Defendants have conspired and combined with each other, and with third parties, to make wrongful deductions from leaseholders' royalty payments, and have achieved a meeting of the minds, through either express or tacit agreement, on an object or course of action of the conspiracy, including depriving Plaintiffs and the Class of their right to royalties pursuant to leasehold contracts.

136.   Defendants have formed and operated a civil conspiracy with each other, performing as a part of the conspiracy numerous overt acts in furtherance of the common design, including one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal.  Defendants conspired to convert Plaintiffs' and the Class's property.

137.   Defendants intended to injure, and succeeded in injuring, Plaintiffs and the Class to the extent of the wrongful deductions alleged herein without legal justification.

138.   As a result of the conduct of Defendants and the conspiracy, Plaintiffs and the Class have been damaged as described herein.

139.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered and continue to suffer damages.  Plaintiffs and the Class are entitled to recover from Defendants all damages and costs permitted.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the members of the Class and Contract Subclass and award the following relief:

A.      That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class and Contract Subclass and Plaintiffs' counsel as counsel for the Class and Contract Subclass;

B.      That the conduct alleged herein be declared, adjudged, and decreed to be unlawful;

D.      Compensatory, consequential, and general damages in an amount to be determined at trial;

E.      Costs and disbursements of the action;

F.      Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

G.      Pre- and post-judgment interest;

H.      Reasonable attorneys' fees;

I.      That Defendants be enjoined from the conduct challenged herein; and

J.      Such other and further relief as this Court may deem just and proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.


Dated June 20, 2014                                  Respectfully submitted,

                                                     **ROSENN JENKINS &**
                                                     **GREENWALD LLP**


                                                     _____
                                                     Robert D. Schaub (PA 42466)
                                                     15 South Franklin Street
                                                     Wilkes-Barre, PA 18711
                                                     Tel: (570) 826-5652
                                                     Fax: (570) 706-3424
                                                     Email:  rschaub@rjglaw.com


                                                     **KESSLER TOPAZ**
                                                     **  MELTZER & CHECK, LLP**
                                                     Joseph H. Meltzer (PA 80136)
                                                     Peter A. Muhic (PA 73501)
                                                     Tyler S. Graden (PA 205844)
                                                     Monique M. Galloway (PA 3008039)
                                                     280 King of Prussia Road
                                                     Radnor, PA 19087
                                                     Tel: (610) 667-7706
                                                     Fax: (610) 667-7056
                                                     Email:  jmeltzer@ktmc.com
                                                             pmuhic@ktmc.com
                                                             tgraden@ktmc.com
                                                             mgalloway@ktmc.com

                                                     *Attorneys for Plaintiffs*