## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE SUESSENBACH FAMILY LIMITED PARTNERSHIP, JAMES S. SUESSENBACH,** *individually and on behalf of himself and all others similarly situated*, **and GINA M. SUESSENBACH,** *individually and on behalf of all others similarly situated,* | : : : : : | **CIVIL ACTION NO. 3:14-1197** **(JUDGE MANNION)** |
| **Plaintiffs** | : | |
| **v.** | : | |
| **ACCESS MIDSTREAM PARTNERS, L.P., and CHESAPEAKE ENERGY CORPORATION,** | : : | |
| **Defendants** | : : | |

### MEMORANDUM

Pending before the court are a motion to dismiss the plaintiffs' complaint filed on behalf of Chesapeake Energy Corporation, ("Chesapeake Energy"), (Doc. 23), and a motion to dismiss the plaintiffs' complaint filed on behalf of Access Midstream Partners, L.P., ("Access Midstream"), (Doc. 26). Based upon the court's review of the motions and related materials, the motions will be denied in large part, with the only exception being the plaintiffs' claim of honest services fraud alleged as a predicate offense in support of their RICO claim.

### I.    PROCEDURAL HISTORY

By way of relevant background, on June 20, 2014, the plaintiffs,

individually and behalf of all others similarly situated, brought the instant action against Chesapeake Energy and Access Midstream, in which they assert the following causes of action: violations of the Racketeer Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. §§1961-1968; conspiracy to violate the RICO Act, 18 U.S.C. §1962(d); unjust enrichment; conversion; and civil conspiracy. (Doc. 1).

On August 26, 2014, Chesapeake Energy filed a motion to dismiss the plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6), (Doc. 23), along with a supporting brief, (Doc. 24). That same day, Access Midstream filed a motion to dismiss the plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6), (Doc. 26), along with a supporting brief, (Doc. 27). The plaintiffs filed a combined brief responsive to the defendants' motions to dismiss on October 3, 2014. (Doc. 41). On October 30, 2014, Access Midstream and Chesapeake Energy filed their reply briefs, (Doc. 44, Doc. 45, respectively).

## II.    STANDARD OF REVIEW

The defendants' motion to dismiss is brought  pursuant to the provisions of Fed.R.Civ.P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the

complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 544. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. Id. Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. See Sands v. McCormick, 502 F.3d 263 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l

Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Generally, the court should grant leave to amend a complaint before dismissing it as merely deficient. See, e.g., Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).

## III.   DISCUSSION

### A.   Plaintiffs' Allegations

The following allegations are taken directly from the plaintiffs' complaint. As set forth above, the court accepts any factual allegations as true for purposes of the instant motions to dismiss. Induced hydraulic fracturing, commonly known as hydrofracking or fracking, is a technique used to release petroleum, natural gas (including shale gas, tight gas, and coal seam gas), or other substances for extraction. The technique creates fractures from a wellbore drilled into reservoir rock formations.

Fracking enables the production of natural gas and oil from rock

4

formations below the earth's surface, generally 5,000 to 20,000 feet. At such depth, there may not be sufficient permeability or reservoir pressure to allow natural gas and oil to flow from the rock into the wellbore at economic rates. Given the extremely low natural permeability of shale, creating fractures in the rock is critical to extract gas from shale reservoirs.

Large deposits of natural gas have been discovered in various shale deposits throughout the United States, including in Pennsylvania, and several oil and gas exploration and development companies have been actively accessing these deposits due to the development of fracking technology that allows the deposits to be exploited. The Marcellus Shale formation located in and beyond Pennsylvania is one of the largest natural gas reserves in the world. Plaintiffs' lands are located in the Marcellus Shale.

Gaining access to the deposits in the shale regions, including the Marcellus Shale, typically involves purchasing or leasing land or mineral rights in the vicinity of suspected deposits and attempting to develop profitable wells. Once a natural gas deposit is reached, a wellhead is placed on the deposit. After a wellhead is in place, natural gas can be moved from the well through gathering pipes and ultimately transported through an intrastate transmission pipeline. Intrastate transmission pipelines connect to major interstate transmission pipelines which transport natural gas throughout the United States. The transport and processing steps which follow removal of natural gas from the wellhead, but precede entry of the gas into an interstate

5

transmission pipeline, are sometimes referred to as "gathering." Access Midstream operates between the lessors at the wellhead and the interstate pipeline system.

Processing can also include certain services to make gas suitable for entry into the interstate pipeline system, such as dehydration when the natural gas has a high water content. Access Midstream as indicated, however, "[i]n general, the natural gas in the northern Marcellus Shale is lean and typically requires little to no treatment to remove contaminants."

While federal rules limit fees that can be charged on the interstate pipelines to prevent gouging, drilling companies levy fees on local pipelines, known as gathering lines. However, even where such fees are deducted, they must be reasonable and actual.

On August 3, 2010, Chesapeake Energy formed Access Midstream and began spinning off its midstream assets, which included its natural gas gathering and intrastate pipeline operations, through a series of sales to Access Midstream in order to fund its ongoing operations. During this time, Chesapeake Energy was using its subsidiaries to artificially inflate deductions charged to lessors.

In December 2011, Chesapeake Energy completed the sale of Appalachia Midstream Services, L.L.C., ("AMS"), a wholly owned subsidiary of Chesapeake Midstream, and AMS's Marcellus Shale midstream assets for $865 million in total consideration. In February 2012, Chesapeake Energy

6

announced its intent to sell additional midstream assets, and on December 20, 2012, Chesapeake Energy completed the sale of its subsidiary Chesapeake Midstream Operating, L.L.C., ("CMO"), to Access Midstream, including CMO's Marcellus Shale midstream assets, for $2.16 billion in total consideration.

When Chesapeake Energy sought to spinoff its gathering operations, it turned to J. Michael Stice, the President and Chief Operating Officer of Chesapeake Midstream and Senior Vice President of Natural Gas Projects for Chesapeake Energy from November 2008 through December 2012, to run the operation. Mr. Stice then became the Chief Executive Officer of Access Midstream following its acquisition of the CMO midstream assets. Domenic J. Dell'Osso, Jr., was the Executive Vice President and Chief Financial Officer of Chesapeake Energy since November 2010 and Chief Financial Officer of Chesapeake Midstream from August 2008 to November 2010. Both Stice and Dell'Osso have served as directors of Access Midstream's general partner, Access Midstream Partners GP, L.L.C., since July 2012 and July 2011, respectively.

According to an article published by *ProPublica*[1], an independent non-profit organization, post-spinoff agreements between Chesapeake Energy and Access Midstream guarantee that Chesapeake Energy and certain of its subsidiaries and affiliates get a rebate of some of the monies they will pay out

[1]Lustgarten, Abrahm, "Chesapeake Energy's $5 Billion Shuffle", *ProPublica*, March 13, 2014, available at http://www.propublica.org/article/chesapeake-energys-5-billion-shuffle, last accessed March 19, 2015.

to Access Midstream in the form of payments for services and additional assets. Among other things, Access Midstream received a guarantee from Chesapeake Energy that personnel and employees would be made available to it during a transitional period and that certain services would be provided to Access Midstream that would be paid going forward. Access Midstream is managed and directed by former and current Chesapeake Energy officers, has made extensive use of other Chesapeake Energy employees in conducting its operations, and continues to pay Chesapeake Energy and affiliates and subsidiaries for a variety of services.

In connection with Access Midstream's acquisition of Chesapeake Midstream's operating assets, Access Midstream replaced Chesapeake Midstream as the beneficiary of certain contractual obligations and entered into gas gathering agreements with several Chesapeake Energy subsidiaries, ("Gathering Agreements"). Pursuant to the Gathering Agreements, Chesapeake Energy's subsidiaries agreed to pay Access Midstream for natural gas gathering and transportation services, including intrastate transport. For example, under the Gathering Agreement covering CMO's former Marcellus Shale assets ("Marcellus Gathering Agreement"), Chesapeake Appalachia's[2] payments to Access Midstream for gas gathering and transportation services are referred to as the "Marcellus fee" and described as "a cost-of-service based fee." However, the *ProPublica* report

_____

[2]Chesapeake Appalachia is a subsidiary to Chesapeake Energy.

details that the fee is not actually "cost-of-service" based, but was instead intended to provide Access Midstream with a guaranteed, above-market return as an incentive and consideration for the payments it made to Chesapeake Energy. Explained in the *ProPublica* article, "[a]n executive at a rival company who reviewed the deal at *ProPublica's* request said it looked like Chesapeake had found a way to make the landowners pay the principal and interest on what amounts to a multi-billion loan to the company from Access Midstream."

In fact, the Marcellus Gathering Agreement has a 15-year term and provides that on January 1 of each year, the Marcellus fee will be recalculated to provide "a specified pre-income tax rate of return on invested capital." In other words, it was structured to insure a guaranteed rate of return to Access Midstream for a 15-year period. *ProPublica* has reported the 15% rate of return: "Chesapeake pledged to pay Access enough in fees to repay the $5 billion plus a 15 percent return on its pipelines." Chesapeake's ability to follow through on its promise to lock in Access Midstream's rate of return relies on continued inflation of gathering costs and other services paid to Access Midstream and deducted from oil and gas lessors' royalty payments.

Fully aware of the true market rates of such services, Chesapeake Energy and its subsidiaries agreed to this above-market rate of return and then Chesapeake Energy agreed to pay Access Midstream supra-competitive prices for natural gas gathering and transportation services, as part of the renewed agreement with Access Midstream to repay the off-balance sheet

loan provided by Access Midstream to Chesapeake Energy. Chesapeake Energy's subsidiaries, such as Chesapeake Appalachia, have, in turn, passed the costs of the services along to Pennsylvania oil and gas lessors, such as plaintiffs, by deducting the inflated expenses built into the Marcellus fee from lessors' royalty payments.

The *ProPublica* article details how Chesapeake Energy's subsidiaries have deducted amounts far in excess of their payments to Access Midstream for gas gathering and transportation services. Chesapeake Energy's subsidiaries have paid fees, which are then charged to lessors, for gas pipeline transport to Access Midstream that are many multiples (in some cases, more than 30 times) of Access Midstream's actual costs. These "wrongful" royalty deductions are detailed in the plaintiffs' royalty statements, upon which the plaintiffs relied and assumed were reasonable. These deductions were inflated, improper, completely unrelated to the "cost of services," did not serve to enhance the marketability of the gas, and instead, merely served to enrich the co-conspirators who devised the scheme. Access Midstream's predominant source of revenue is gathering fees and Chesapeake Energy accounts for approximately 84% of Access Midstream's business.

The Suessenbachs entered into an oil and gas lease with Anadarko E&P Company LP, ("Anadarko"), on or about May 11, 2006, covering 135.6 acres of their property, ("Primary Lease"). Prior to May 28, 2010, Chesapeake

10

Appalachia entered into an agreement with Anadarko to purchase a portion of the Suessenbach's leasehold and thereby became bound by its terms. Separately, on or about December 19, 2008, the Suessenbachs entered into a Paid Up Oil & Gas Lease directly with Chesapeake Appalachia for a 2-acre parcel of land not previously covered by the Primary Lease.

In order to facilitate Chesapeake Energy's drilling and fracking operations in the Marcellus Shale formation, Chesapeake Energy's subsidiaries, such as Chesapeake Appalachia, enter into agreements to lease land from Pennsylvania residents. In some cases, Chesapeake Energy's subsidiaries purchase rights to existing leases to which it becomes a party as lessee. These lease agreements, such as those originally entered into by the Suessenbachs, give Chesapeake Energy's subsidiaries the right to extract oil and natural gas from lessors' lands and to transport and sell the oil and gas.

In return for the right to extract oil and gas, the lease agreements promise a royalty to the lessors based on the price ultimately realized by Chesapeake Energy's subsidiaries for the oil and gas. Pursuant to Pennsylvania's Guaranteed Minimum Royalty Act, ("GMRA"), that amount is the minimum permissible by law and requires leaseholders to receive at least 12.5%, or one-eighth, of the sales price of the gas extracted from their land.

The Suessenbach's Primary Lease states:

LESSEE shall pay the LESSOR on oil and liquid hydrocarbons produced and saved from the premises . . . the market value at the well of one eighth (1/8) of the oil and liquid hydrocarbons so used or sold. In no event shall the gas royalty payable hereunder be

11

computed on the basis of a price the collection of which by LESSEE is unlawful or prohibited by order or regulation of any governmental authority having jurisdiction, and market value at the well shall not exceed the amount realized by LESSEE for such production computed at the well . . . LESSEE may pay all taxes and fees levied upon LESSOR'S royalty share of production of oil and gas, and deduct the amount so paid from any monies payable to LESSOR hereunder.

The 2-Acre Lease states:

[Lessee agrees] [t]o pay Lessor an amount equal to one-eighth (1/8) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee.

The Primary Lease allows deductions for the "production of oil and gas" and the 2-Acre Lease identifies deductions for "the cost to transport, treat and process the gas," but nowhere does either lease permit deductions in excess of actual cost or which are unreasonable. Royalty deductions must be reasonable and must be proportionate to lessors' minimum guaranteed royalty under the GMRA, i.e., lessors' post-production deductions cannot exceed 12.5% of total post-production costs. Notwithstanding these limitations, defendants, under the guise of Chesapeake Energy's subsidiaries' agreements with lessors, exploited deductions language from the lease agreements to, among other things, shift repayment of Chesapeake Energy's off-balance sheet loan from Access Midstream to the lessors. Plaintiffs allege their royalty statements reflect the following:

•       October 23, 2012 deduction of approximately 23% from the

royalty payment;

- November 21, 2012 deduction of approximately 25% from the royalty payment;

- February 21, 2013 deduction of approximately 19% from the royalty payment;

- April 23, 2013 deduction of approximately 21% from the royalty payment;

- May 23, 2013 deduction of approximately 19% from the royalty payment;

- October 23, 2013 deduction of approximately 24% from the royalty payment; and

- January 31, 2014 deduction of approximately 39% from the royalty payment.

By taking these and other deductions, and thereby reducing royalty payments, defendants capitalized on a contract to which they were not parties, but through which they could produce guaranteed revenue by forcing the plaintiffs to pay grossly inflated deductions. Chesapeake Energy reported to investors in September 2013 that its expenses related to pipeline and marketing business roughly doubled in the months after it sold certain pipelines and that its revenues for that part of the business also increased accordingly, covering the new costs. Industry analysts could not explain the change in revenues and expenses.

13

According to the allegations in the plaintiffs' complaint, the "scheme" alleged above constitutes mail and/or wire fraud in violation of 18 U.S.C. §§1341 and 1343. To this extent, the plaintiffs allege that the conduct of defendants and their co-conspirator, Chesapeake Appalachia, constituted the execution of a scheme and artifice to deprive oil and gas lessors in Pennsylvania of royalties properly due them by means of fraudulent pretenses and representations through the use of the United States mail in violation of 18 U.S.C. §1341. Their use of the mails formed a central feature of the scheme and included sending oil and gas lessors royalty statements and royalty payments which reflected deductions for artificially inflated gas gathering and transportation fees pursuant to the Gathering Agreements. According to the plaintiffs' complaint hundreds, and likely many thousands, of such royalty statements and royalty payments have been sent to Pennsylvania lessors through the mails and wires across state lines. Each of these statements and payments fraudulently represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases. Moreover, defendants and their co-conspirator, Chesapeake Appalachia, made fraudulent and untrue statements regarding deductions and volume adjustments for marketing that were represented to reflect legitimate costs rather than the scheme as alleged, including by multiple email transmissions. The plaintiffs allege that each of the royalty statements sent to plaintiffs

represent an instance of mail fraud. The plaintiffs allege that the defendants'
conduct constituted multiple violations of mail fraud under 18 U.S.C. §1341,
which is a predicate offense for purposes of 18 U.S.C. §1962(c).

In addition, defendants and their co-conspirator, Chesapeake
Appalachia, have on a monthly basis transferred payments between
themselves by wire, which payments were made pursuant to the non-arm's
length and conspiratorial agreements described above. The plaintiffs allege
that this conduct constituted multiple violations of wire fraud under 18 U.S.C.
§1343, which is also a predicate offense for purposes of 18 U.S.C. §1962(c).

The plaintiffs also claim that the scheme, as alleged above, constitutes
"honest services" fraud in violation of 18 U.S.C. §1346. At all relevant times,
defendants and their co-conspirator, Chesapeake Appalachia, owed legal
duties to render services to lessors. In all cases, those duties included
extracting oil and natural gas and deducting expenses only where appropriate.
The value of these services depended on defendants and Chesapeake
Appalachia rendering those services in an honest manner. Nevertheless, the
plaintiffs allege that defendants misused their position and thereby breached
their obligation to render "honest services" to lessors. The plaintiffs allege that
defendants devised a scheme or artifice to defraud plaintiffs and other
landowners of their intangible right to Chesapeake Appalachia's honest
services through these inflated deductions.

Based upon the above allegations, the plaintiffs set forth five causes of

15

action. First, the plaintiffs allege that the defendants' actions amounted to violations of the RICO Act. Specifically, they allege that the plaintiffs and each member of the purported class are "persons" as that term is defined in 18 U.S.C. §§1961(3) and 1962(c). The plaintiffs allege that, for purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§1961(4) and 1962(c), consisting of defendants, including their respective officers, directors, employees, agents, and direct and indirect subsidiaries, (the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise and was primarily managed by Chesapeake Energy, which organized the fraudulent scheme and procured the involvement of Access Midstream. Each of the defendants, however, agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent direction.

The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding leaseholders by overcharging them for costs associated with extraction of oil and natural gas which the co-conspirators deemed to be expressly permitted by leaseholder agreements between lessors and Chesapeake Appalachia. At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce. The proceeds of the Enterprise were distributed to its participants, including Chesapeake Energy and Access Midstream.

The Enterprise has operated since at least 2010, and its operation is

16

ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering in which defendants engaged.

The plaintiffs allege that at all relevant times, in violation of 18 U.S.C. §1962(c), the defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. §1961(5), by virtue of the conduct set forth above. The defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

- defendants knew that the fees charged by Access Midstream, including under the Marcellus Gathering Agreement, were far in excess of the market rates of such fees;

- defendants knew and agreed that Access Midstream would rebate a portion of these inflated fees to Chesapeake Energy and its subsidiaries and affiliates, ostensibly for the use of other equipment and services;

- defendants knew and agreed that the inflated gas gathering and transportation fees would be passed along to Pennsylvania oil and gas lessors by Chesapeake Appalachia in the form of cost deductions from the lessors' royalty payments;

- the unlawful conduct by defendants, through the alleged

17

association-in-fact Enterprise, deprived thousands of lessors of their rightful royalty payments, was continuous and open-ended, and was intended to continue and continues today; and

- plaintiffs and the members of the class were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of defendants. The financial harms suffered by plaintiffs and members of the class were the direct result of that conduct and were the intended and reasonably foreseeable consequence of such conduct.

The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§1341 and 1343. Specifically, defendants engaged in an intentional scheme or artifice to defraud lessors and to obtain money or property from said lessors through false or fraudulent pretenses, representations, and promises.

The conduct of defendants in violation of the mail and wire fraud statutes included without limitation, a fraudulent scheme to deprive the lessors of their intangible rights to Chesapeake Appalachia's "honest services" in violation of 18 U.S.C. §1346. As alleged in the complaint, Chesapeake Appalachia owed a contractual obligation to render services to the lessors. Chesapeake Appalachia owed a duty to render those services in an honest manner. Nevertheless, defendants misused their position to interfere with the

18

contractual obligations to which the lessors were entitled. Chesapeake Appalachia thereby was caused to breach its obligations to render "honest services." Defendants also owed a duty not to charge unreasonable fees to Chesapeake Appalachia which, known by defendants, would be passed on to lessors. Each of the defendants intentionally and willfully conspired and participated in the "honest services" violations. Specifically, each of the defendants participated in devising and carrying out the scheme through the activities alleged in the complaint.

The plaintiffs allege that it was reasonably foreseeable to the defendants that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme. The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The plaintiffs allege that the precise dates of such transmissions cannot be determined without access to the books and records of the defendants.

For the purpose of furthering and executing the scheme, the defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data, and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. Defendants used the mails and/or wires for the purpose of furthering and

19

executing the scheme.

The plaintiff's royalty statements attached to the complaint are examples of instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by the defendants. Each electronic and/or postal transmission was incident to an essential part of the scheme. Additionally, each electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud lessors.

Defendants each participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud lessors into paying and/or incurring falsely inflated, unauthorized charges in connection with their oil and gas leases. The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. §1961(5). The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding lessors to pay and incur the falsely inflated, unauthorized charges with respect to oil and gas leases and thereby enable defendants to reap illicit profits. Defendants were common participants in the predicate acts and their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive lessors.

As a direct and proximate result of violations of 18 U.S.C. §1962(c) by defendants, plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. §1964(c). Plaintiffs paid falsely inflated, unauthorized

royalty deductions by reason, and as a direct, proximate, and foreseeable result, of the scheme alleged. Plaintiffs' continued payment of inflated and unreasonable deductions evidence their reliance on the defendants' misstatements. Moreover, the overcharging of plaintiffs for gathering services was an integral and necessary part of the scheme, as those overcharges constituted repayment of, among other things, the cash payment made by Access Midstream to Chesapeake Energy.

In their second cause of action, the plaintiffs allege that the defendants violated 18 U.S.C. §1362(d) by conspiring to violate 18 U.S.C. §1362(c), the substantive elements of which are alleged above.

The plaintiffs' third cause of action is a state law claim for unjust enrichment. In support of this claim, the plaintiffs allege that the defendants, by their policies and actions, benefitted from, and increased their profits by effecting a scheme which deprived plaintiffs of the full royalties due to them. Chesapeake benefitted from the royalty amounts wrongfully withheld by its subsidiary, Chesapeake Appalachia, whose financial results are included in Chesapeake Energy's and whose costs were substantially reduced by not paying the proper royalty amounts. Access Midstream benefitted from the royalty amounts wrongfully withheld by Chesapeake Appalachia because some of the monies which should have been paid to oil and gas lessors were instead paid to Midstream Access. Defendants accepted and received the benefits of royalty monies properly due plaintiffs. The plaintiffs allege that it is

inequitable and unjust for defendants to retain these monies, which were procured by fraudulent pretenses and representations. According to the plaintiffs, they are entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by defendants plus interest on these amounts.

As their fourth cause of action, the plaintiffs allege the state law claim of conversion. Specifically, the plaintiffs allege that defendants wrongfully and intentionally caused deductions to be taken from their royalty payments and that they were entitled to receive the wrongfully deducted amounts pursuant to leasehold contracts. Plaintiffs allege that defendants collected these wrongful deductions through agreements between affiliates of Chesapeake Energy and Access Midstream that resulted in charges assessed against lessors' royalty payments by Chesapeake Appalachia. Defendants have retained these funds unlawfully without the consent of plaintiffs and have deprived them from exercising control over these funds which belong to the plaintiffs. The plaintiffs allege that the defendants intend to permanently deprive plaintiffs of these funds. The funds are specific and readily identifiable pursuant to royalty statements largely in the control of defendants or Chesapeake Appalachia. The plaintiffs allege that the funds taken by Chesapeake Appalachia ultimately were received by defendants as part of the coordinated conduct alleged above.

The plaintiffs' final cause of action is a state law civil conspiracy claim

which alleges that defendants have conspired and combined with each other, and with third parties, to make wrongful deductions from leaseholders' royalty payments, and have achieved a meeting of the minds, through either express or tacit agreement, on an object or course of action of the conspiracy, including depriving plaintiffs of their right to royalties pursuant to leasehold contracts. The plaintiffs allege that defendants have formed and operated a civil conspiracy with each other, performing as part of the conspiracy numerous overt acts in furtherance of the common design, including one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal. The plaintiffs allege that the defendants conspired to convert their property and intended to injure, and succeeded in injuring, plaintiffs to the extent of the wrongful deductions alleged in the complaint without legal justification.

## B.    Defendants' Motions to Dismiss[3]

The defendants have filed motions to dismiss the plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6) arguing that, for several reasons, the plaintiffs' complaint does not state a RICO claim. The federal RICO statute creates a civil remedy, including an award of treble damages, costs, and

---

[3]In large part, the defendants' motions to dismiss are duplicative and are therefore given consolidated consideration.

attorneys fees, for "any person injured in his business or property" by a violation of one of RICO's substantive provisions. 18 U.S.C. §1964(c). Pursuant to 18 U.S.C. §1962(c), it is unlawful for "'any person' who is employed by or associated with 'any enterprise' affecting interstate commerce to 'participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" Genty v. Resolution Trust Corp., 937 F.2d 899, 906 (3d Cir. 1991) (quoting 18 U.S.C. §1962(c)). The RICO statute defines racketeering activity by a list of crimes, or "predicate offenses," including federal crimes such as bribery, mail fraud and wire fraud. 18 U.S.C. §1961(1).

In this case, the plaintiffs allege that the predicate offenses consisted of mail and wire fraud. The elements of mail and wire fraud are: (1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme. United States v. Riley, 621 F.3d 312, 329 (3d Cir. 2010); United States v. Yusuf, 536 F.3d 178, 187-88 & n.14 (3d Cir. 2008).

The defendants argue that the plaintiffs have failed to allege cognizable injury because the gathering rate related to the royalties did not increase after the defendants entered into the Marcellus Agreement in December 2012.[4]

---

[4]In support of this argument, Chesapeake Energy provides that an effective relevant gathering rate can be calculated from the face of the plaintiffs' royalty statements attached
(continued...)

Upon review, the plaintiffs have alleged the Marcellus Gathering Agreement, through which they allege the inflated gathering expenses were justified under the guise of legitimacy, "provides that, on January 1 of each year, the Marcellus fee will be recalculated." They have further alleged that the deductions from their royalty statements jumped from 24% in October 2013 to 39% in January 2014. The plaintiffs allege that this increase in deductions is consistent with Chesapeake's report "to investors in September 2013 that its expenses related to pipeline and marketing business roughly doubled in the months after it sold certain pipelines", as well as statements by industry analysts who were unable to explain the "staggering" increase in gathering and transportation expenses. At this stage of the proceedings, the court finds the plaintiffs have sufficiently pleaded an injury. Thus, the defendants' motions to dismiss will be denied on this basis.

Even assuming that the plaintiffs have alleged injury, the defendants argue that the complaint does not plausibly allege that defendants' alleged predicate acts of mail and wire fraud caused the plaintiffs' injuries. The

---

[4](...continued)
to the complaint which evidences that the plaintiffs' gathering rate did not increase after December 2012. (Doc. 24, p. 11; Doc. 45, p. 5). Whether the royalty statements appended to the plaintiff's complaint can, in fact, be demonstrated to support the plaintiffs' claim of decreased royalty payments after the defendants' entered into the gathering agreements, or whether Chesapeake Energy's calculation is the accepted method by which to calculate such gathering rate, are questions of fact which the court is not to resolve on a motion to dismiss. The plaintiffs have alleged that deductions from their royalties increased after the defendants entered into certain gathering agreements. This is sufficient to allege injury at this stage of the proceedings, and it will be for the plaintiff to establish those injuries further on in the litigation.

defendants argue that there is a disconnect between the harm alleged, i.e., the gathering charges that were too high, and the predicate acts which the plaintiffs allege, i.e., the mailing of royalty statements. According to the defendants, this is because the plaintiffs' actual claim is that they were harmed by the Gathering Agreement itself and not the mailings that followed. Chesapeake Energy argues the plaintiffs' failure to allege that the predicate acts actually caused their harm is fatal to their RICO claim.

RICO plaintiffs must demonstrate that their injuries were the direct result of the defendants' predicate acts. See Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 457 (2006) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 (1985)) ("The compensable injury flowing from a violation of [§1962(c) ] 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'"). The plaintiffs cannot establish liability merely by showing that they suffered harm from an otherwise legal action of the enterprise unconnected to the predicate acts. See V-Tech Svcs., Inc. v. Street, 215 Fed.App'x. 93, 96 (3d Cir. 2007). Instead, the plaintiffs must demonstrate that the predicate acts directly and proximately caused the injury of which the plaintiffs complain. See id. ("[P]roximate cause requires a direct relation between the injury claimed and the injurious conduct alleged."); see also Smith v. Berg, 247 F.3d 532, 539 (3d Cir. 2001). Three factors govern whether the plaintiffs have established the requisite proximate

cause for a RICO claim: (1) whether the plaintiffs were directly harmed by the defendants' predicate acts, (2) whether damages are speculative or concrete, and (3) whether alternative potential plaintiffs exist who could better redress the harm alleged. See Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 443 (3d Cir. 2000).

Upon review of the plaintiffs' filings, the plaintiffs have alleged that the defendants conspired to provide Chesapeake Energy with needed cash by effecting an off-balance sheet loan and satisfying repayment of the loan by disguising inflated deductions from lessors' royalty payments. Specifically, it is alleged that the defendants conspired to "extract billions of dollars in royalties owed to Plaintiffs and other lessors by artificially manipulating and deducting from royalty payments the cost of 'marketing,' 'gathering,' and 'transporting' natural gas. The plaintiffs allege that the mailings at issue in this case were incident to an essential part of the scheme. In order to carry out the scheme, defendants sent through the mail statements reflecting the artificially inflated deduction for gas gathering and transportation fees. According to the plaintiffs' complaint, the mailings were a key component in disguising the true nature of the deductions from the plaintiffs' royalty payments. The plaintiffs allege that the defendants artificially inflated the gathering and transportation costs so that the amounts reflected on the royalty statements sent to the plaintiffs did not reflect the true cost-of-service, but instead reflected the cost-of-service with significant additional amounts added on so that Chesapeake

Energy could repay Access Midstream.

According to the plaintiffs, these mailings were further designed to lull plaintiffs and other lessors into believing that no fraudulent scheme had occurred. In fact, the Third Circuit has found that mailings "designed to lull victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place" are sufficient to support a claim for mail fraud. See U.S. v. Lebovitz, 669 F.2d 894, 896 (3d Cir. 1982) (quoting U.S. v. Maze, 414 U.S. 395, 403 (1974). The plaintiffs argue that the mailings here, in fact, provided a "cloak of legitimacy" to an otherwise fraudulent scheme deceitfully conveying to the plaintiffs that the deductions from their royalties were authorized.

The court finds that, at this stage of the proceedings, the plaintiffs have sufficiently pleaded the requisite proximate cause for a RICO claim. To this extent, they allege that the predicate mailings transmitted the fraudulent royalty statements, as well as the royalty underpayments which were based on the statements. The plaintiffs have further alleged that the harm caused by the fraudulent mailings and wires is concrete and measurable. Finally, the plaintiffs allege that they were directly harmed by the defendants' RICO violations and that others are no better situated to redress the harm alleged. The defendants' motions to dismiss will be denied on this basis.

The defendants next argue that the plaintiffs' complaint should be

dismissed because the complaint does not adequately allege a scheme to defraud.

A scheme to defraud has been defined as "any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another or by which someone intends to deprive another of something of value." Coleman v. Commonwealth Land Title Ins. Co., 684 F.Supp.2d 595, 614-15 (E.D. Pa. 2010). The plaintiffs may satisfy their burden by showing a scheme to defraud involving "some sort of fraudulent misrepresentation or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Id. (quoting Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991)). Deceitful statements, half truths, or the knowing concealment of material facts are all actionable under the mail and wire fraud statutes. Id. (citing United States v. Townley, 665 F.2d 579, 585 (5th Cir. 1982)).

> The statements need not be false or fraudulent on their face, and the accused need not misrepresent any fact, since all that is necessary is that the scheme be reasonably calculated to deceive a person of ordinary prudence and comprehension, and that the mail service of the United States be used in the execution of the scheme.

Id. Moreover, the plaintiffs must allege that the defendants acted with an intent to defraud, which is to act knowingly and with the intention to deceive or to cheat. Id. (citing United States v. Hoffecker, 530 F.3d 137, 181 (3d Cir. 2008)). "An intent to defraud is ordinarily accompanied by a desire or a purpose to

29

bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." Id. (citing United States v. Leahy, 445 F.3d 634, 644 (3d Cir. 2006)).

Here, the defendants argue that the plaintiffs' claims are barred by the Third Circuit's decision in Kolar v. Preferred Real Estate Invs., Inc., 361 Fed.App'x. 354 (3d Cir. 2010), in which the court found that plaintiffs cannot "transmute" a contract claim into a RICO action "by simply appending the terms 'false' and 'fraudulent'" to their allegations. Id. at 363-64. However, as set forth in the section outlining the allegations of the plaintiff's complaint, as well as in the section immediately above, the plaintiffs are alleging something more than a simple breach of contract claim. To this extent, the plaintiffs are alleging that the defendants entered into an unlawful agreement to purposefully charge inflated gathering and transportation costs for the specific purpose of disguising the true nature of the deductions from lessors' royalty payments. Thus, beyond the terms of their contracts, of which the defendants are not parties, the plaintiffs allege that the defendants engaged in fraudulent transactions specifically to disguise the fact that the defendants were deducting monies that they were not legally entitled to and were unlawfully profiting at the plaintiffs' expense. These allegations, even if connected to the leases, concern a specific intent to defraud and deceive the lessors. These actions, whether or not they also constitute a breach of contract, appear to go beyond a simple breach of contract claim and bring them into the realm of

RICO. The court finds that these allegations are sufficient to allege a scheme to defraud and the defendants' motions to dismiss will be denied on this basis.

Along this same line, defendant Access Midstream separately argues that, because the plaintiffs' claims sound in contract, until any breach of contract claim is resolved, any damages under RICO are speculative and therefore the RICO claim must be dismissed. As indicated above, the plaintiffs claims go beyond a breach of contract claim. Moreover, to the extent that the plaintiffs can establish their RICO claim, damages related to inflated gathering and transportation costs are readily calculable and therefore not speculative. As such, defendant Access Midstream's motion to dismiss on this basis will be denied.

The defendants also argue that the plaintiffs cannot establish "honest services" fraud. (Doc. 24, pp. 18-19). As indicated previously, the plaintiffs have alleged that the defendants engaged in honest services fraud pursuant to 18 U.S.C. §1346, which provides that a "'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In Skilling v. United States, 561 U.S. 358, 408-11 (2010), the Supreme Court held that §1346 criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks." Id. The plaintiffs here argue that they allege two distinct sets of kickbacks that deprived them of honest services. First, they argue that instead of engaging in arms' length business transactions, Chesapeake Energy paid artificially inflated gathering

and transportation fees to Access Midstream for the purpose of rewarding its willingness to provide Chesapeake Energy with a $5 billion loan – with both Access Midstream and Chesapeake Energy knowing full well that the cost of the unreasonably high-priced gathering and transportation costs would be wrongfully assessed to lessors. Second, the plaintiffs argue that Access Midstream rebated a portion of these inflated fees to Chesapeake Energy to induce the continued inflation of gathering and transportation costs. The plaintiffs argue that these kickbacks sufficiently establish that defendants breached their obligations to render honest services.

In considering the plaintiffs' claims, while it has been found that the honest services fraud statute covers bribery or kickback schemes involving private individuals, as well as public individuals, the consensus is that there must be shown a fiduciary duty in order to sustain such a claim. Pre-Skilling, courts recognized the viability of a honest services claim against a private individual when the individual stands in a fiduciary relationship with the victim of the fraud. See e.g. United States v. Williams, 441 F.3d 716, 721-724 (9th Cir. 2006) (citing United States v. Rybicki, 354 F.3d 124 (2d Cir. 2003) (citing precedent from the Second, Eighth, and Tenth Circuits in which the honest services fraud statute was applied to various fiduciary relationships)). Subsequently, in Skilling, the Court limited the honest services conduct to that addressed in cases pre-dating McNalley v. United States, 483 U.S. 350 (1987), the case which prompted Congress to pass §1346, in order to avoid

concerns about unconstitutional vagueness. In its discussion, the Court noted that  the 'solid core' of honest services precedent involved 'offenders who, *in violation of a fiduciary duty*, participated in bribery or kickback schemes.' Skilling, 561 U.S. at 407 (emphasis added). The plaintiffs have not alleged such a fiduciary relationship in this case. Therefore, the court will grant the defendants' motions to dismiss on this basis.

The defendants further argue that the plaintiffs' complaint does not allege a "pattern of racketeering activity" or a "threat of continued criminal activity" as RICO requires and, therefore, it must be dismissed. A pattern of racketeering activity requires proof of two predicate acts, committed within a ten year period, that are "related, and . . . amount to or pose a threat of continued criminal activity." Kehr Packages, Inc. v. Fideicor, Inc., 926 F.2d 1406, 1411-12 (3d Cir.) ((quoting H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989)), *cert. denied*, 501 U.S. 1222 (1991); Bardsley v. Powell, Trachtman, Logan, Carrie & Bowman, P.C., 916 F.Supp. 458, 463 (E.D.Pa. 1996), *aff'd*, 106 F.3d 384 (3d Cir. 1996).

Predicate acts are "related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir. 1995) (quoting H .J., Inc., 492 U.S. at 240). Continuity can be either an "open ended" or a "closed ended" pattern. Here, the plaintiffs allege a "closed ended" pattern. The "closed

ended" pattern simply refers to a "closed period of repeated conduct" and requires a showing of events occurring over a "substantial" period of time. H.J., Inc., 492 U.S. at 241; Tabas, 47 F.3d at 1292. In the Third Circuit, a period of time less than twelve months will not satisfy the close ended requirement. See Tabas, 47 F.3d at 1293.

The defendants argue that the plaintiffs' claims all relate to a purported *quid pro quo* surrounding the Marcellus Gathering Agreement. Because this was a one-time transaction, the defendants argue that it cannot constitute a pattern of racketeering activity. According to the defendants, the continued mailings are of no consequence because the "pattern" requirement is not satisfied just because "a particular fraudulent scheme involved numerous otherwise 'innocent' mailings, rather than only a few." The defendants argue that the court must look beyond the mailings to determine whether the complaint alleges one scheme or separate fraudulent actions. For this same reason, the defendants argue that the complaint does not allege a threat of continued criminal activity. Because the plaintiffs have not alleged that Chesapeake Energy's sale of its midstream assets to Access Midstream will be repeated, the defendants argue that there is no threat of continued activity.

The plaintiffs counter that their RICO claims are not simply predicated on the singular act of the defendants entering into the Gathering Agreement, but are predicated as well on the long term and continued deduction of excessive amounts from the plaintiffs' royalty checks under the guise of

34

legitimacy. The plaintiffs allege that the royalty statements and emails had a similar purpose and result, that is to falsely withhold amounts due lessors under the guise of legitimacy. The plaintiffs further allege that they were sent from the same participants, Chesapeake Energy and its affiliates, to similar victims, the lessors, and were part of a grand scheme, which was the creation and repayment of an off-balance sheet loan for Chesapeake Energy. The plaintiffs allege that the defendants' scheme has persisted for several years and that the fifteen year term of the Marcellus Gas Gathering Agreement ensures that the predicate acts will pose a continued threat of criminal activity well into the future.

The court is aware, as the defendants cite, of the case law which directs that, in cases involving allegations of mail fraud, the court should look beyond innocent mailings and examine the underlying scheme or artifice to determine whether there is a pattern of racketeering activity. See Kehr Packages, Inc. v. Fidelcor, Inc., supra. However, in this case, the allegations suggest that the mailings are not simply 'innocent' mailings, but are in themselves fraudulent in that they contain inflated fees in order to enable the defendants to falsely withhold amounts due lessors under the guise of legitimacy. The court finds the plaintiffs' allegations at this stage of the proceedings, to allege a pattern of racketeering activity. As such, the defendants' motions to dismiss will be denied on this basis.

The defendants also argue that the plaintiffs' complaint does not

adequately allege that it conducted or participated in the affairs of a RICO enterprise through a pattern of racketeering. The defendants argue that the plaintiffs' allegations that they committed RICO violations through a purported "association-in-fact . . . consisting of Defendants, including their respective officers, directors, employees, agents, and direct and indirect subsidiaries" does not allege facts sufficient to establish the "direction" and "nexus" RICO requires. Specifically, Chesapeake Energy argues that the complaint does not adequately allege facts capable of establishing that it "directed" the affairs of the alleged enterprise.

A plaintiff must establish that the defendants were associated with and participated in the "operation or management" of the enterprise to bring a cause of action pursuant to civil RICO. Reves v. Ernst & Young, 507 U.S. 170, 184 (1993). In order for a defendant "to conduct or participate" in the affairs of a RICO enterprise, a defendant must, in some capacity, direct the affairs of the enterprise. Id. at 178-79. A defendant will not be liable simply because he provides services that benefit the enterprise; instead, there "must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus. To say it another way, the person must knowingly engage in 'directing the enterprise's affairs' through a pattern of racketeering activity." University of Maryland at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993). That does not always mean that a defendant must have a managerial position in the

enterprise, but only that he or she "knowingly further[s] the illegal aims of the enterprise by carrying out the directives of those in control." United States v. Parise, 159 F.3d 790, 796 (3d Cir. 1998).

Here, the plaintiffs have sufficiently alleged that the defendants participated in the conduct of the Enterprise. To this extent, they allege that Chesapeake Energy sought an off-balance sheet loan from Access Midstream, its former subsidiary, disguised as asset sales with repayment to be unlawfully funded by inflated charges to the plaintiffs. The purpose of the off-balance sheet loan was to hide Chesapeake Energy's need for cash without alerting the market to its financial troubles. Instead of repaying the loan with legitimate funds, the plaintiffs allege that Chesapeake Energy, through its wholly owned subsidiary, Chesapeake Appalachia, and Access Midstream entered into gathering agreements knowing that the fees to be charged by Access Midstream were far in excess of the market rates of the fees; knowing that Access Midstream would rebate a portion of the inflated fees to Chesapeake Energy and its subsidiaries and affiliates; knowing that the inflated gas gathering and transportation fees would be passed along to lessors in the form of cost deductions from the lessors' royalty payments; and knowing that the plaintiffs were the intended targets of the scheme. The plaintiffs allege that Chesapeake Energy and Access Midstream were aware that Chesapeake Energy's affiliates had the authority to deduct certain expenses from the lessors' royalty payments and they conspired to abuse that

37

authority to deduct unlawful amounts from lessors' royalty payments in order to enrich themselves. In light of these allegations, the defendants' motions to dismiss will be denied on this basis.

The defendants also argue that because the plaintiff's substantive RICO claim fails, so too must their RICO conspiracy claim. With respect to this argument, a RICO conspiracy is not a mere conspiracy to commit the underlying predicate acts. It is a conspiracy to violate RICO - that is, to conduct or participate in the activities of a corrupt enterprise. See Salinas v. United States, 522 U.S. 52, 62 (1997) ("Before turning to RICO's conspiracy provision, we note the substantive RICO offense, which was the goal of the conspiracy[.]" (emphasis added)); Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990) ("[A] defendant can be liable under RICO's conspiracy provision for agreeing to the commission of a pattern of racketeering activity." (emphasis added)); United States v. Elliott, 571 F.2d 880, 902 (5th Cir. 1978) ("[T]he object of a RICO conspiracy is to violate a substantive RICO provision here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity."). Thus, if the plaintiff's claim under §1962(c) does not state a cognizable claim, their §1962(d) conspiracy claim must necessarily fail. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993). Here, the court has found that, at this stage of the proceedings, the plaintiffs are entitled to go forward with

their substantive RICO claim.

In the alternative, Chesapeake Energy argues that the plaintiffs have failed to allege the requisite agreement to sustain a RICO conspiracy claim. In their complaint, the plaintiffs allege that each of the defendants agreed to enter into a scheme which they all knew would require inflated charges to be passed along to lessors under the guise of valid royalty deductions in order for Chesapeake Energy to meet its obligations under the gathering agreements. The plaintiffs' allegations are sufficient for present purposes to allege the requite agreement in order to continue with their RICO conspiracy claim. As such, the defendants' motions to dismiss the plaintiffs' complaint on this basis will be denied.

Next, the defendants argue that the plaintiffs' state law claim for unjust enrichment fails because their claim arises under leases and they are therefore limited to a breach of contract claim. Because the leases can provide the plaintiffs with recourse against Chesapeake Appalachia, with which the plaintiffs entered into the leases, the defendants argue that they cannot seek recovery from them through a claim of unjust enrichment.

"[T]o establish a claim for unjust enrichment under Pennsylvania law, a party must show 'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'" Stoeckinger v. Presidential Financial

Corp. of Delaware Valley, 948 A.2d 828, 833 (Pa.Super.Ct. 2008) ); see also Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000). "To prevail, 'a claimant must show that the party against whom recovery is sought has received a benefit that would be unconscionable for [it] to retain.'" Mass. Mut. Life Ins. Co. v. Curley, 459 Fed.Appx. 101, 108 (3d Cir. 2012) (citations omitted)).

Here, the plaintiffs have alleged that a substantial monetary benefit was conferred upon the defendants derived from the inflated gathering costs paid by the plaintiffs which were used by Chesapeake Energy to repay the $5 billion loan to Access Midstream along with a guaranteed rate of return. In addition, they have alleged that the defendants appreciated the benefit from the inflated gathering expenses deducted from the plaintiffs' royalty payments in that Chesapeake Energy was able to obtain needed cash through an off-balance sheet loan while Access Midstream was guaranteed to recover $5 billion plus a 15% return all paid through the inflated royalty deductions. Finally, the plaintiffs have alleged that it is inequitable for the defendants to retain the benefit because it is they who have wrongfully paid the price for the defendants' benefit.

While the plaintiffs did enter into leases with Chesapeake Appalachia, the allegations of the complaint are that Chesapeake Energy and Access Midstream were the parties that unjustly benefited from the profits generated from the inflated royalty deductions. Because the plaintiffs are not in

contractual privity with either Chesapeake Energy or Access Midstream, the plaintiffs' claim for unjust enrichment may proceed against them. See Baker v. Family Credit Counseling Corp., 440 F.Supp.2d 392, 420 (E.D.Pa. 2006) (allowing claims for unjust enrichment to proceed against defendants who were not parties to the original contract) (citing Com. ex rel. Pappert v. Tap Pharm. Products, Inc., 885 A.2d 1127, 1137-38 (Pa. Cmwlth. Ct. 2005)). Thus, the court will deny the defendants' motion to dismiss the plaintiffs' unjust enrichment claim.

The defendants also argue that the plaintiffs' claim for conversion fails because Pennsylvania law does not permit a plaintiff to convert a breach of contract into a tort action. Along this line, the defendants argue that the conversion claim is barred by the gist of the action doctrine and under the economic loss doctrine. (Doc. 24, pp. 28-30).

Pennsylvania courts have defined "conversion as an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession." Norriton East Realty Corp. v. Central-Penn Nat'l Bank, 254 A.2d 637, 638 (Pa. 1969). A defendant need not engage in "conscious wrongdoing," but can be liable for conversion through "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." Id. (citations omitted).

The "gist of the action" doctrine is "designed to maintain the conceptual distinction between breach of contract claims and tort claims." eToll, Inc., v.

41

Elias/Savion Adv., Inc., 811 A.2d 10, 14 (Pa.Super.Ct. 2002) ("Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements."). The doctrine bars tort claims "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." Reed v. Dupuis, 920 A.2d 861, 864 (Pa.Super.Ct. 2007).

Similar to the gist of the action doctrine, under the "economic loss doctrine," a plaintiff may not recover in tort for what is otherwise an allegation sounded in contract. This is especially true when there is no personal injury or property damage. Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002) (interpreting Pennsylvania law); Reilly Foam Corp. v. Rubbermaid Corp., 206 F.Supp.2d 643, 658 (E.D.Pa. 2002) (same). "Although the Pennsylvania Supreme Court has not ruled on the issue, the Third Circuit has predicted that it would not create an exception to the economic loss doctrine for intentional torts." Tubman v. USAA Cas. Inc. Co.,      F.Supp.2d     , 2013 WL 1809345, at *4 (E.D.Pa. Apr. 20, 2013) (citing Werwinski v. Ford Motor Co., 286 F.3d 661, 680-81 (3d Cir. 2002). While the Werwinski court predicted that the Pennsylvania Supreme Court would not adopt a blanket exception to the economic loss doctrine for intentional fraud, it also noted with approval an

42

"emerging trend" that "recognize[s] a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent[ly] of the underlying contract." Werwinski, 286 F.3d at 676 (citations omitted). Such an exception would allow a plaintiff to bring a fraud claim "only if the fraud is 'extraneous to the contract,' not 'interwoven with the breach of contract.'" Id. (citations omitted). Nevertheless, there remains a split among courts in Pennsylvania and the federal district courts regarding the applicability of the economic loss doctrine to intentional fraud claims. See, e.g., Oldcastle Precast, Inc. v. VPMC, Ltd., 2013 WL 1952090, at *11 (E.D.Pa. May 13, 2013) (collecting cases).

With respect to the instant action, the court initially notes here that there is no contract between the plaintiffs and defendants. Moreover, it is not apparent at this stage of the litigation that the gist of the claim sounds in contract as opposed to tort. As such, it is premature to dismiss the plaintiffs' conversion claim under the gist of the action doctrine. "[I]n the context of the gist of the action doctrine, '[c]aution must be exercised in dismissing a tort action on a motion to dismiss because whether tort and contract claims are separate and distinct can be a factually intensive inquiry.'" Covertech Fabricating, Inc. v. TVM Bldg. Products, Inc., 2014 WL 2605427, at *6 (W.D. Pa. June 11, 2014) (citing Raymond v. Lundy, 2000 WL 804432 (E.D. Pa. June 22, 2000, *aff'd sub nom.* Lundy v. Hochberg, 79 F. App'x 503 (3d Cir. 2003)). See also CH & H Pennsylvania Properties, Inc. v. Heffernan, 2003 WL

22006799, at *6 n.6 (E.D.Pa. Aug. 20, 2003) (declining to apply the gist of the action doctrine without an intensive inquiry into the facts); Mill Run Associates v. Locke Prop. Co., Inc., 282 F.Supp.2d 278, 291 (E.D.Pa. 2003) (same). Moreover, as with the gist of the action doctrine, the conversion claim will not be dismissed on account of the economic loss doctrine. Thus, the defendants' motions to dismiss based upon the gist of the action and economic loss doctrines will be denied.

Finally, the defendants argue that the plaintiffs' complaint does not state a civil conspiracy claim because the plaintiffs have failed to plead an actionable underlying tort, because they have not plausibly pled malice, and because their contradictory pleading prevents a finding that "two or more conspirators" agreed to commit an unlawful act.

As discussed above, the court has found that the plaintiffs have alleged an actionable tort at this stage of the proceedings. Thus, the defendants' initial basis for dismissing the civil conspiracy claim is without merit.

As to the defendants' malice argument, under Pennsylvania common law, a civil conspiracy requires that two or more conspirators reached an agreement to commit an unlawful act or perform a lawful act by unlawful means. See Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979); Burnside v. Abbott Laboratories, 505 A.2d 973, 980 (Pa.Super. 1985). Additionally, a plaintiff must show an overt act and actual legal damage. Phillips v. Selig, 959 A.2d 420 (Pa.Super. 2008) (internal citations omitted).

44

Finally, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." Commerce Bank/Pennsylvania v. First Union Nat. Bank, 911 A.2d 133, 143 (quoting Thompson Coal Co., 412 A.2d at 472). "Malice requires . . . that the sole purpose of the conspiracy was to injure the plaintiff," and that this intent was without justification. Doltz v. Harris & Assoc., 280 F.Supp.2d 377, 389 (E.D.Pa. 2003).

Here, the plaintiffs allege that the defendants engaged in a scheme to defraud and deprive the plaintiffs of duly owed royalty payments by manipulating and misrepresenting certain post-production costs incurred and charged. The plaintiff's allege that these inflated costs were deducted from the plaintiff's royalties and used by the defendants to unjustly enrich themselves in relation to the deal made on the $5 billion off-balance sheet loan made by Access Midstream to Chesapeake Energy. No justification has been shown to exist for this scheme. These actions allegedly harmed the plaintiffs. Moreover, knowingly misusing another's property for one's own ends qualifies as malice. See e.g., Strayer v. Bare, 2008 WL 1924092 (M.D.Pa. April 28, 2008). If the plaintiffs can prove their allegations, they would be entitled to relief against the defendants. Therefore, the defendants' motion to dismiss will be denied on this basis.

Lastly with respect to this claim, as argued by the plaintiffs, the defendants' argument that the civil conspiracy claim must fail because the plaintiffs have alleged a RICO enterprise, is without merit. Courts have found

45

at the motion to dismiss stage that RICO and civil conspiracy claims can co-exist. See e.g., Freedom Medical, Inc. v. Gillespie, 634 F.Supp.2d 490, 517-18 (E.D.Pa. 2007); Cranberry Promenade, Inc. v. Cranberry Twp., 2010 WL 653915, *6 (W.D.Pa. Feb. 22, 2010); Marshal v. Fenstermacher, 388 F.Supp.2d 536, 553-54 (E.D.Pa. 2005). Therefore, the defendants' motion to dismiss will be denied on this basis.

## IV.    CONCLUSION

Based upon the foregoing, the defendants' motions to dismiss will be granted in part and denied in part. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date:  March 31, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-1197-01.wpd

46